IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARION WEINREB & ASSOCIATES, INC. | * | |
| | * | |
| v. | * | Civil No. JFM-04-3836 |
| | * | |
| VALOGIC, LLC | * | |

*****

MEMORANDUM

Plaintiff Marion Weinreb & Associates, Inc. ("MWA") brings this action to enforce an agreement with defendant VaLogic, LLC ("VaLogic"). Both parties move for summary judgment. For the reasons stated below, MWA's motion is granted and VaLogic's is denied.[1]

I.

The facts in this case are not in dispute. On June 21, 2001, MWA accepted a solicitation issued by SAIC-Frederick, Inc. ("SAIC") for subcontract work on a large prime contract between SAIC (a private contractor) and the National Cancer Institute Frederick Cancer Research & Development Center ("NCI") (a federal government entity). Pursuant to the SAIC-MWA subcontract, MWA was responsible for providing "validation of process services," which refers to "a) the independent development of testing methodologies and protocols; and b) testing and certification that goods or services, as incorporated within a process or methodology, are in compliance with 21 C.F.R. Parts 210, 211, 600 and 800, which regulations are otherwise known as Good Manufacturing Practices." (Stipulation of Material Facts ¶ 9.) During November 2001, MWA and VaLogic entered into a written agreement ("the 2001 agreement"), and MWA

---

[1]MWA also moves to strike the declaration of VaLogic President William C. Robertson because his declaration purportedly is not based on personal knowledge and contains conclusory allegations. VaLogic filed a supplemental declaration that cures any defects, and, regardless, my decision does not rely on Robertson's declaration. Therefore MWA's motion is denied.

subcontracted to VaLogic the validation of process services work. The 2001 agreement contained a non-compete clause prohibiting VaLogic from taking on additional work from MWA's clients during the time the companies worked together and for six months afterward.

On August 28, 2003, upon the expiration of the SAIC-MWA contract, SAIC issued another competitive solicitation for bids to provide validation of process services. Both MWA and VaLogic wanted to bid on the new contract, and from September 10 through 12 they negotiated over whether VaLogic would be permitted to submit a bid. At roughly 9 a.m. on September 12, the parties signed a "Letter of Intent" under which VaLogic would pay MWA $144,000 for the right to bid and an additional $144,000 if VaLogic actually won the contract. The Letter of Intent included a statement that MWA agreed not to submit its own bid. VaLogic submitted a bid about two hours later, at 11:20 a.m.

That afternoon, Peter Greenburg, counsel for MWA, called David Greber, counsel for VaLogic, to express concerns that the proposed agreement under the Letter of Intent represented bid rigging under applicable Federal Acquisition Regulations ("FAR") because it purported to prevent MWA from bidding on the SAIC solicitation. Greber expressed his belief that Greenburg's concerns were unfounded and that there was no issue of bid rigging. However, he indicated he had limited knowledge of and experience with the FAR.

At around 4:20 p.m., Greber faxed a signed letter to Greenburg, the purpose of which was to "confirm the terms of the agreement" between VaLogic and MWA. (Stipulation of Material Facts, Ex. 5.) The letter said VaLogic had already bid on the contract earlier in the day, in reliance on the Letter of Intent. The letter confirmed VaLogic would pay MWA $144,000 and an additional $144,000 if VaLogic won the contract. The letter stated that VaLogic never

intended to preclude MWA from bidding and would not object to a bid by MWA. On the second page of the letter, Greenburg wrote by hand: "The above accurately describes the occurrences and discussions this date." Greenburg signed and dated the letter and faxed it back to Greber at around 4:35 p.m. This letter is known as the "Sept. 12 agreement."

Subsequently, VaLogic came to believe the 2001 agreement constituted bid rigging and VaLogic had never been obliged to refrain from bidding on the second SAIC solicitation. SAIC awarded the contract to VaLogic on October 9, 2003, but VaLogic refused to pay the money promised to MWA in the Sept. 12 agreement. MWA brought suit against VaLogic to enforce the agreement, and both parties moved for summary judgment. At the conclusion of a hearing on these motions on October 7, 2005, I rejected VaLogic's argument that the Sept. 12 letter is not a binding contract and asked the parties to submit additional briefs on the question of whether federal law or policy prevent me from enforcing the Sept. 12 agreement. Before addressing this latter issue, I will briefly reiterate the reasons for my oral rulings made at the conclusion of the hearing.

II.

VaLogic presents two main arguments why the Sept. 12 agreement does not constitute a binding contract. First, VaLogic contends that a clearly illegal transaction cannot be the basis of a valid compromise. *See* 15A Am. Jur. 2d *Compromise and Settlement* § 28 (2005) ("If a claim is based upon an illegal transaction, the relinquishment of the claim will not constitute good consideration for a compromise; as long as the illegality of the transaction is not disputed or doubted, there cannot be a valid compromise, regardless of whether there is a dispute or uncertainty as to other matters involved in the transaction."). The fallacies in this argument are

3

that the 2001 agreement was not clearly illegal and the Sept. 12 agreement was not a compromise. The correspondence between MWA and VaLogic shows that on September 12, 2003, both parties believed in good faith that the 2001 agreement was valid.[2] Moreover, this belief was reasonable. *See Wickman v. Kane*, 766 A.2d 241, 247 (Md. Ct. Spec. App. 2001) ("A claim or defense can be 'reasonably doubtful' because of uncertainty about the facts *or* the law."). Although the non-compete agreement in the 2001 agreement might have been unlawful under California law, it was far from certain that California law governed that agreement. *See ABF Capital Corp. v. Grove Props. Co.*, 23 Cal. Rptr. 3d 803, 809 (Cal. Ct. App. 2005) (describing the test California applies to contracts not containing a choice of law provision). Likewise, the 2001 agreement was not clearly illegal under federal law. Although I do not agree with MWA's argument that the process services were "commercial items" - thus requiring MWA to treat the government as it would other purchasers, *see* 41 U.S.C. §2539g - the argument is not entirely frivolous. More importantly, as stated in part III, *infra*, no federal statute or regulation expressly voids an agreement containing a provision between subcontractors (or, as here, a subcontractor and a sub-subcontractor) prohibiting one of them from submitting a bid on a subsequent federal government contract.

Second, VaLogic argues the parties did not reach a clear agreement and the Sept. 12 letter is an unenforceable agreement to agree in the future. *See Horsey v. Horsey*, 620 A.2d 305, 319 (Md. 1993) ("it is generally held that an 'agreement to agree' is unenforceable"). VaLogic contends the parties had yet to agree on "the most essential term" at issue, which VaLogic claims

---

[2] At the time, the parties questioned the validity of the letter of intent but VaLogic did not raise concerns about the validity of the 2001 agreement until weeks later.

4

was "the removal of a provision from the [2001 agreement] that may have been in violation of the federal acquisition regulations." (Def.'s Opp'n to Pl.'s Mot. for Summ. J. at 1.) This simply is not accurate. Again, the potential illegality of the 2001 agreement was not even contemplated by the parties on September 12. While the Letter of Intent could arguably be an agreement to agree, because it was contingent upon review and approval by MWA's counsel, the Sept. 12 follow-up letter contained the four corners of an agreement, clarified the terminology in the Letter of Intent, and was signed by both parties' counsel. The parties plainly reached a resolution in this letter: VaLogic agreed to pay MWA in return for MWA's promise to release VaLogic from liability under the non-compete provision of the 2001 agreement.[3] Therefore, I find the Sept. 12 letter constitutes a binding contract.

III.

The remaining question is whether the enforcement of the Sept. 12 agreement would itself be unlawful. The reason I raised the question at the conclusion of the October 7, 2005 hearing was that in the letter of intent signed by the parties on September 12, 2003, MWA agreed not to submit a proposal to SAIC.[4] Upon reflection, I have concluded that my concern was unfounded because although the letter of intent contained this provision, the Sept. 12

---

[3]VaLogic also argues that inclusion of an acceleration clause in a proposed modification of the 2001 agreement that MWA sent to VaLogic on September 26, 2003, proves there was no agreement on September 12. This argument is similarly unpersuasive. The acceleration clause was a new, immaterial term that could be accepted or rejected.

[4]Unfortunately, I did not make myself as clear as I should have. Apparently, the parties believed that my concern was that enforcement of the Sept. 12 agreement would violate federal law because it contained restrictions on VaLogic. That is not the case. In fact, the Sept. 12 agreement lifted the prohibition imposed upon VaLogic by the 2001 agreement not to submit a bid to SAIC.

5

agreement itself - the document constituting the binding contract - stated unequivocally that MWA had not been prohibited from submitting a bid (although, in the interim, it had not done so).

In any event, even if the non-compete provision contained in the letter of intent had survived the expressly contrary statement of intent contained in the Sept. 12 agreement, that provision would not have invalidated the Sept. 12 agreement. 41 U.S.C. § 253g and 48 C.F.R. §§ 52.203-2 and 52.203-6 do require that contracts between the government and a contractor include a provision prohibiting the contractor from "enter[ing] into any agreement with an actual or prospective subcontractor . . . which has or may have the effect of restricting sales by such subcontractors directly to the Government of any item or process . . . made or furnished by the subcontractor under this contract or any follow-on production contract." Here, however, § 253g and the implementing regulations apply only to the contract between NCI (the federal government entity) and SAIC (the prime contractor).[5] They do not require that the same provision be contained in agreements between subcontractors or a subcontractor and sub-subcontractor (such as MWA and VaLogic).

VaLogic has not cited any case holding that the reach of § 253g and the implementing regulations extends that far or that the inclusion of a non-compete clause in a subsidiary agreement between government subcontractors otherwise voids the remainder of the agreement.

---

[5]It is not entirely clear from the record whether the contract between NCI and SAIC included the required provision prohibiting non-compete agreements. However, even if the provision was not expressly so included, it should be deemed to be inserted into the contract as a matter of law pursuant to the doctrine established in *G.L. Christian & Assoc. v. United States*, 312 F.2d 418 (Ct. Cl. 1963), *rehrg. denied*, 320 F.2d 345 (Ct. Cl. 1963). *See S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993).

Absent such authority, I am unwilling to find that the federal interest in favor of competitive bidding is so strong that it entitles a party to an agreement who has received the agreement's benefits to obtain judicial nullification of the agreement because it contains a non-compete clause. Here, assuming that the provision contained in the letter of intent prohibiting MWA from bidding on the new SAIC solicitation survived the contrary statement of intent contained in the Sept. 12 agreement, that would be the precise result. VaLogic would be deemed to have been granted the right of bidding on the new SAIC solicitation - a right the parties reasonably believed it did not possess until the Sept. 12 agreement was made - without paying to MWA the monetary consideration it promised.

  A separate order effecting the rulings made in this memorandum is being entered herewith.


March 29, 2006        /s/
Date            J. Frederick Motz
              United States District Judge